IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


ENRIQUETA PINON,

        Plaintiff,

v.                                                      CIV 03-633 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.


# MEMORANDUM OPINION AND ORDER

      Plaintiff Enriqueta Pinon was fifty-three when an Administrative Law Judge ("ALJ") found that she retains the residual functional capacity to perform a limited range of light work. Although she cannot perform her past work as a housekeeper, the ALJ determined with the aid of the testimony from a vocational expert that Pinon can perform two types of jobs. Thus, the ALJ denied benefits, finding her not disabled at Step 5, under the framework of Medical-Vocational Rules. The Appeals Council declined review on March 25, 2003, thereby rendering the ALJ's decision final. *See e.g., Administrative Record* ("*Record*") at 6-8, 17-22.

      This matter is before the Court on Plaintiff's motion to reverse or remand, where she asserts that the ALJ committed four errors. *See Docs. 8, 9.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 2, 7.* The entire record has been read and carefully considered. I find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

# I.  Background

### A.  1997 - 1998 Surgeries & Denial Of First Application

Plaintiff apparently was born with a condition known as "MPS"[1] that resulted in a "Chiari I malformation."[2]  As an adult, the condition caused "syringomyelia,"[3] which manifested as paresthesias and pain in her arms.  *Record* at 153-54.  Pinon underwent surgery to correct the condition in 1997, and immediately following the surgery was limited to not lifting more than ten pounds.  Thereafter she resumed working.  A year after the first surgery, she underwent a second surgery in July 1998 because she was having pain behind her left ear, thought to be caused by nerve damage from the first surgery.  She continued working.  *See e.g., Id.* at 125, 149-50,152-57, 299-300; *see also id.* at 297-98, 301 (duplicates of hospital records at 152-54).

Almost a year and a half after the second surgery, Plaintiff returned to the surgeon who performed the second surgery "complaining of pain in her occipital/suboccipital area [and also was] depressed because of the recent divorce of her daughter."  *Id.* at 155.  The surgeon

---

[1]  "MPS" or "mucopolysaccharidosis" is defined as an inherited metabolic disorder that can stunt a child's growth and development.  See www.medterms.com.

[2]  The Chiari type I malformation . . . is an uncommon, complex, neuromuscular deformity which is present at birth. . . .   Instead of the brainstem sitting in its proper space, the brainstem is displaced downward into the funnel, thus causing pressure on this part of the brain and spinal cord. . . .   This downward displacement of the cerebellar tonsils (brain tissue) is called the Chiari malformation [and] the Chiari I malformation more frequently causes problems in adults.
www.surgery.missouri.edu/ns/chiari/aboutchiarimalformation.htm.

[3]  Syringomyelia is defined as an abnormal fluid cavity (something like a long blister) inside the spinal cord [which] causes pressure and disrupts the normal function of the nerves that travel from that area of the cord. . . . The most common cause of syringomyelia is the Chiari Malformation.
www.surgery.missouri.edu/ns/chiari/aboutchiarimalformation.htm.  Symptoms can include pain, tingling, numbness and/or weakness in the extremities.  *Id.*

prescribed Neurotin for "rather vague" complaints of "generalized pain." Pinon was instructed to call "any time for [follow-up] or medication change." If the prescription did not help the pain, the surgeon contemplated referral to a pain clinic." *Id.* There are no medical records from November 1999 until Plaintiff's automobile accident in March 2001.

Nevertheless, Pinon filed for benefits in March 2000 asserting that she became disabled as of her November 1999 visit with the surgeon. At the time of this application she was still working, but not frequently as before allegedly because of constant pain. She noted that she was taking Neurotin and that the prescription caused no side effects. *See id.* at 73-77, 91-97, 101.

Agency physician Nancy Nickerson, M.D. completed a residual functional capacity form the same month Plaintiff filed this application. She concluded that Pinon could perform medium work. Dr. Nickerson further observed that the two surgeries had resolved her previous chronic pain and that her current complaint of pain was not attributed to a medical impairment. The physician also noted, however, that Plaintiff "was found credible" and that her surgeon had prescribed medication. *See id.* at 267-72. The Administration denied her application based on this assessment on March 31, 2000. *See id.* at 46.

### B. 2001 Automobile Accident & Second Application

In March 2001, Plaintiff was involved in a terrible and tragic automobile accident and suffered severe injuries requiring surgery to fuse vertebrae in her spine. She ceased working after the accident. After completing physical therapy, she filed an application for supplemental security benefits. For the June 14, 2001 application, she alleged onset as of the date of the accident, which had left her in pain, unable to lift more than two pounds, and unable to bend. *See e.g., id.* at 79-81, 106, 125, 149-50,169-72, 234-43.

A couple of weeks after she filed the June 2001 application, Plaintiff underwent an upper abdominal ultrasound because of "epigastric pain, bilateral upper quadrant pain." However, her gallbladder, bile duct, liver, pancreas and kidneys were all normal. *Id.* at 330.

Later that summer and throughout the Fall, Plaintiff complained of back and abdominal pain and was prescribed Zantac for her gastric complaints and Celebrex or Aleve for pain. The post-surgery healing of her spine and ribs showed a severe compression at T7 and some rib "deformity," but the spine was "stable," and her ribs either had healed or were healing satisfactorily. *See id.* at 248 (duplicated at 325), 326, 328-29. The results of an "upper GI w/scout film" were normal. *Id.* at 247.

Pinon was then referred to another physician, who recommended further tests to rule out an ulcer or cancer, but no tests were conducted in the Fall 2001. *Id.* at 244. Instead, the following April 2002, Plaintiff saw yet another doctor, who found her "abdomen soft w/ tenderness in the epigastric and hypogastric area without rebound tenderness . . . some tenderness on the ribs on the lower part of the right side of the thorax," and he ordered tests. *Id.* at 345.

Those tests proved normal, Plaintiff was prescribed Prilosec, and the doctor recommended that she continue with the Prilosec if she was "doing well" on it. *See id.* at 341-44, 347. Just prior to the ALJ's hearing, Plaintiff indicated that she was taking Prevacid. *See id.* at 147.

At some point, a clinic treated Plaintiff with Bactrim for a urinary tract infection and, at four and eight weeks after the April 2002 tests, found her abdomen was "soft and nontender . . . [n]ormal bowel sounds . . . [no] masses or organomegaly." *Id.* at 333-34, 337. The clinic's notes did, however, reflect that Pinon had been severely burned twenty-four years earlier and had a neck strain. Neurotin was prescribed. *Id.* at 333.

4

### C.  *Work Restrictions from Dr. Pacheco*

None of Plaintiff's treating physicians put her on restrictions after the automobile accident. Then, in July 2002 Dr. H.O. Pacheco of the Texas Tech University Health Science Center at El Paso issued a two-month "no work" restriction. He reissued a three-month "no work" restriction in September 2002. The ALJ held his hearing in October 2002. These work status forms are unaccompanied by any explanation for the restrictions. *See id.* at 350-51.

The only other records from the Center are those immediately following the accident which indicate that Dr. Pacheco reviewed x-rays showing Plaintiff's spine to be stable and the hardware intact. Although she was "doing well," she did receive an injection in her shoulder. *See id.* at 260-65. In August 2001 she was again reported as "doing well." *Id.* at 258. In February 2002, Dr. Pacheco referred Plaintiff for an evaluation and thereafter she was prescribed Aleve for rib pain. *Id.* at 256, 266.

### D.  *Hearing Testimony*

Plaintiff's daily activities report indicates that Pinon takes care of her personal needs, makes beds and meals, attends water aerobics classes several times a week and walks daily. However, she needs help lifting heavy things, has others vacuum, sweep, and mop, and cannot climb steps. It also states that she cannot drive because she cannot turn her head, and cannot write a letter because of pain associated with "arching over" and holding up her head. *See id.* at 137-42.

Pinon's hearing testimony is essentially consistent with the daily activities report, except she testified her pain is a "nine" or "ten" and her medication only causes the severity to lessen to an "eight." *Id.* at 34-39. On the other hand, Plaintiff has suffered no side effects from her

medications. *Id.* at 37. She testified that changes in the weather, especially rain and cold, aggravate the pain which lasts constantly until the weather improves. *Id.* Pinon also testified somewhat inconsistently that episodes of pain last approximately three days. *Id.* at 35. Contrary to her daily activities report, at the hearing she testified that she does drive. *See id.* at 39.

Plaintiff further asserted that approximately three or four times a day, she must lie down for ten minutes to an hour each day in between tasks and wears a cervical collar when she does so. *Id.* at 36. While her 1997 and 1998 surgeries "helped" for a year, now her arms and hands hurt and she drops things. *See id.* at 35-36, 39-40. While she is depressed due to worry about what will happen to her son and takes medication to help her sleep, Plaintiff has not seen a counselor. *See id.* at 38.[4]

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44

---

[4] It is not clear whether she has not seen a counselor due to lack of funds or some other reason, because the record on that point is inaudible. However, her failure to seek counseling is not at issue here.

F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## III. Analysis

### *A. Residual Functional Capacity Analysis*

In making his residual functional capacity determination, the ALJ had to determine whether Plaintiff's complaints of complete disabling pain were credible. Plaintiff asserts that the "record is replete with objective assessments of severe debilitating pain" in medical records from her treating physicians, and that the ALJ did not consider every factor in determining whether Plaintiff's complaints of disabling pain were credible. *See Doc. 9* at 3-5. I disagree that the ALJ erred in making his residual functional capacity assessment.

First, the nine medical records Plaintiff cites refers to as "replete objective medical assessments" of pain are, for the most, part the portion of a medical record noting Plaintiff's reported symptoms. More importantly, the selected records are taken out of context. For example, Plaintiff cites to October 29, 1997 complaints of pain and referral to a pain clinic. *Doc. 9* at 3. She neglects to mention the next record dated December 20, 1997 reports Plaintiff as "well healed" and "good pain relief obtained." *Record* at 152.

She next relies on a July 17, 1998 report that notes she developed pain, but neglects to mention that this report is the from the report of the surgery she underwent in 1998 to correct the condition. *See Doc. 9* at 3; *Record* at 156-57. She also relies on the November 1999 doctor visit where she reported pain and was prescribed Neurotin. No medical records demonstrate the Neurotin failed to give her relief.

Plaintiff also relies on five records documenting what happened within six months of her traumatic automobile accident, a time during which one would expect complaints of pain.

7

Plaintiff ignores, however, subsequent records or portions of those records that track her recovery from the accident.[5] The final record Plaintiff cites is a February 2002 record that recommended over-the-counter Aleve for pain. *Doc. 9* at 3; *Record* at 256.

Whereas Plaintiff's selected citations to medical records gives a skewed perspective of them, the ALJ's discussion and conclusion takes all of the records as a whole. The ALJ noted that after her 1997 surgery, Plaintiff "had vague complaints of generalized pain that responded to Neurotin." *Record* at 19. He did not discuss Plaintiff's 1998 surgery or her 1999 visit to the surgeon complaining of pain. Perhaps this is because the surgeries and doctor visit from 1997-1999 were the subject of the first application that was denied. *Id.* In any event, Plaintiff was instructed at her 1999 visit to call the surgeon if the Neurotin did not help. Yet there is a complete absence of any medical records from that visit until her March 2001 automobile accident, and Pinon was working after the 1998 surgery until the automobile accident.

The ALJ next observed that Plaintiff was found to be stable, doing well, and healed or healing six months after the automobile accident. Her abdominal tests were normal, and she was to continue taking Prilosec as long as she was doing well on it. *Id.* The ALJ concluded that:

> Although the claimant has impairments that would reasonably be expected to produce some pain or discomfort, her symptoms are or should reasonable be controlled with medication without substantial side effects. The claimant's allegations of totally disabling impairments is ***not accepted as fully credible*** to the extent it is ***contradicted by an overwhelming preponderance of the objective evidence*** and to the extent it is ***inconsistent with the statements the claimant herself has made to treating sources.***

---

[5] One such record mentions "delirium" and a "GAF of 30." However, as discussed later, it specifically refers to her condition shortly following her hospitalization for the injuries she received in the serious automobile accident. *See Doc. 9* at 3; *Record* at 175-80.

8

*Id.* (emphasis added).

The ALJ accurately characterized the evidence and specifically linked his credibility finding to that evidence. *E.g, Malakowsky v. Barnhart,* 66 Fed. Appx. 7756, 758 (10th Cir. 2003) (and cases cited therein). A failure to discuss all of the factors identified by *Luna* in arriving at the pain credibility finding does not render the decision erroneous, because the formalistic approach Plaintiff is advocating is not required. *E.g., Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000); *see also Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987).

It is also asserted that the ALJ erred in his residual functional capacity analysis because he failed to address her low GAF score in reaching his conclusion. The record demonstrates that the ALJ specifically considered the Exhibit containing the GAF finding. Furthermore, the finding of "delusion" and subsequent assignment of a GAF of 30 was a single current assessment when she was hospitalized for the automobile accident. The "delirium" she was exhibiting was either as a result of the accident or "post-surgical delirium" *See Record* at 178-80. There is simply no other medical evidence showing that Plaintiff was diagnosed with, observed to have, or complained about delusions after her discharge from the hospital.

As the Tenth Circuit has held,

> Under [*Clifton v. Chater,* 79 F.3d 1007 (10th Cir. 1996)] "[t]he record must demonstrate that the ALJ considered all of the evidence," and the ALJ must "'discuss [ ] the evidence supporting his decision, . . . the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects.'" *Id.* at 1009-10. The ALJ, however, need not discuss every piece of evidence. *Id.*
>
> Contrary to Mr. Colbert's contentions, the ALJ's discussion of the medical evidence is legally sufficient. . . . [I]t demonstrates a meaningful analysis of the full medical record and Mr. Colbert's

9

testimony.

*Colbert v. Barnhart,* 85 Fed. Appx. 152, 153 (10th Cir. 2004).  I am presented with precisely the same situation here.

### B.  *Vocational Expert Testimony And "Reliance" On Grids*

Plaintiff claims that the ALJ erred in relying on the grids because she has exertional and nonexertional limitations.  This claim misreads the record.  The ALJ recognized that Plaintiff has limitations that preclude her from a full range of light work and called a vocational expert to testify about the jobs Plaintiff can do with those limitations.  The vocational expert did so and the ALJ relied on that testimony in reaching his decision under the "framework" of the grids.  *See Record* at 20-21.

Finally, when the ALJ asked the vocational expert if a person could perform the jobs identified if that person must take breaks three to four times a day, the vocational expert testified all of the jobs would be eliminated.  Plaintiff argues that the ALJ should have adopted this portion of the vocational expert's testimony and found her disabled.

Although he was not necessarily required to do so, the ALJ gave this variation of the hypothetical to the vocational expert based on Plaintiff's claim of total incapacitation due to pain. *E.g., Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996) (hypotheticals need only reflect impairments and limitations that are borne out by the evidentiary record); *Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir. 1993) ("Without question, the ALJ may restrict the questions to those limitations which he has found to be based upon credible evidence.").  Conversely, he was not bound by that portion of the vocational expert's answer because, as discussed above, he found Plaintiff's testimony about her limitations not fully credible.  *E.g, Talley v. Sullivan,* 908 F.2d

585, 588 (10th Cir. 1990) (vocational expert's response to a hypothetical is not binding on the ALJ if the question sets forth impairments which the ALJ does not accept as true).

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 8)* is DENIED, and the decision of the Commissioner is affirmed. A final order will enter concurrently herewith.

```
_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.
```